**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MOHAMAD TLAIB and AMY KARDEL, individually and on behalf of all others similarly situated, | Case No.: 25-cv-6103 |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| HUEL INC., | |
| Defendant. | |

Plaintiffs Mohamad Tlaib and Amy Kardel, by and through their counsel Coulson P.C., file this Class Action Complaint and Demand for Jury Trial against Huel Inc. ("Defendant") on behalf of themselves and on behalf of a Class (and Subclasses) of similarly situated individuals, and allege, on personal knowledge as to their own actions, and on investigation of counsel as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of individuals who purchased Huel Black Edition ("the Product").

2.      Defendant manufactures and sells high-end powdered beverages that it markets as "[f]ast, nutritious, complete food" and sells at a premium price.[1] Defendant's "bestseller" is the Product, which it touts as a "[h]igh protein complete meal"[2] that is a healthy, rigorously tested,

---

[1] *See* www.huel.com (last visited Oct. 18, 2025).
[2] *Nutritionally Complete Powders,* Huel, https://huel.com/collections/huel-powder (last visited Oct. 18, 2025).

and nutritionally complete "food" that is safe and appropriate for frequent consumption as a person's exclusive source of nutrition.

3.    Recent independent testing revealed, however, that a single serving of the Product contains so much lead (a staggering 6.31 micrograms) that it exceeds a safe *weekly* threshold.[3] The testing also revealed that the Product contains 9.2 micrograms of cadmium, more than double the level that public health authorities say "may be harmful to have daily."[4]

4.    Based on these testing results, nutrition experts cautioned against consuming the Product at all, let alone daily or as an exclusive source of nutrition.[5]

5.    Plaintiffs bring this action on behalf of themselves and a Class (and Subclasses) of similarly situated individuals who purchased the Product, thereby paying premium prices for a product that is marketed as healthy and safe for daily consumption but contains more than *twelve times* the State of California's "maximum allowable dose level."[6]

6.    Defendant's uniform conduct is equally applicable to Plaintiffs and the Class. Plaintiffs bring this class action against Defendant for violation of statutory consumer protection laws, unjust enrichment, and breach of implied warranty. Plaintiffs seek an order requiring Defendants to, among other things: (1) cease its false and misleading representations about the safety and fitness for consumption of its products; and (2) pay damages, restitution, and/or disgorgement to Plaintiffs and Class members.

---

[3] Martineau, Paris, *Protein Powders and Shakes Contain High Levels of Lead*, Consumer Reports, https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last visited Oct. 30, 2025).
[4] *Id.*
[5] *Id.*
[6] *See id.*

## PARTIES

7.     Plaintiff Mohamad Tlaib is a natural person and a citizen of Illinois, where he resides and intends to remain.

8.     Plaintiff Amy Kardel is a natural person and a citizen of California, where she resides and intends to remain.

9.     Defendant Huel Inc. is a Delaware Corporation and subsidiary of Huel Ltd., with its principal place of business in Brooklyn, New York.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), in that (1) the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000; (2) Plaintiffs are citizens of California and Illinois and Defendant is a citizen of New York; and (3) this is a class action involving more than 100 class members and more than two-thirds of the class members reside in states other than the state in which Defendant is a citizen.

11.     This Court has personal jurisdiction over Defendant because Defendant is a citizen of New York, conducts substantial business in New York, and a substantial portion of the acts complained of took place in New York.

12.     Venue is proper in the Eastern District of New York because Defendant's headquarters are located in this District, Defendant conducts business in this District and many of the events that gave rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

13.    Defendant Huel (a portmanteau of "Human Fuel"), manufactures and sells a range of nutrition products like protein powders and ready-to-drink meals that are advertised as plant-based and nutritionally complete.

14.    Defendant has curated its brand image to be a company that makes healthy protein consumption convenient for the consumer.

15.    Defendant's foundational product is Huel "Black Edition," which it touts as a "[h]igh protein complete meal" (in contrast to traditional protein drinks) that is safe and appropriate for unusually frequent consumption—one to multiple times per day—as a person's exclusive source of nutrition.

16.    Defendant reiterates across its website that the Product should be treated as a meal replacement. For example, its website proclaims:

   a.    "This is a *meal*. Not a protein shake."
   b.    "Over *500 Million Meals* Sold"
   c.    "Enjoy a nutritionally complete meal!"
   d.    "Fast, nutritious, *complete* food."



4

17.    Defendant recommends that consumers replace up to a third of their weekly meals with its products, even representing that they can consume the Product for breakfast, lunch, and dinner.



18.    Defendant also advertises the Product as healthy and nutritionally complete. For example, in various places across its website, Defendant says the product is:

a. "Formulated with naturally beneficial ingredients," with "40g protein per meal" and "27 vitamins & minerals."

b. "Designed by expert nutritionists as a convenient way to get all the daily nutrients you need."

c. "Formulated with naturally beneficial superfoods."

d. "Recommended by top performers and nutrition experts."

e. "Formulated by leading nutrition experts, verified by science."

f. "nutritionally complete powdered food that is high in protein and fiber, reduced carbohydrates, and rich in healthy fats."

g. "All-in-one nutrition, saving you money and time."



19. Defendant also advertises that the Product "provide[s] all the nutrients, vitamins, and minerals you need to thrive" and has "[o]ver 160 health benefits including muscle function, reduced fatigue, digestive support, and immune support."

20. To bolster perceptions about the safety of the Product, Defendant also includes numerous representations about testing and standards.

21. Defendant advertises that it sells "[a] formula you can trust. Developed by expert nutritionists. Third-party tested. Backed by science."

22.     Huel even markets the Product as being safe for consumption by pregnant women, posting a video on Instagram saying "All Huel powders . . . are suitable for pregnant people at one serving per day."[7]

 

***Testing Reveals High Levels of Lead and Cadmium in the Product, Exceeding Weekly Recommended Doses***

23.     In October 2025, Consumer Reports released a report of its independent testing of various protein powders, including the Product.

24.     The Consumer Reports testing revealed that the Product contains dangerous levels of lead and cadmium.[8]

---

[7] @huel, Instagram (Aug. 31, 2023), "Spoiler alert: no eating for two required . . ." Instagram, https://www.instagram.com/p/CwnW28dtW1Q/.
[8] Martineau, Paris, *Protein Powders and Shakes Contain High Levels of Lead*, Consumer Reports, https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last visited Oct. 30, 2025).

25.     Specifically, testing concluded that "[o]ne serving of Huel's Black Edition powder contained 6.3 micrograms of lead, or about 1,290 percent of CR's daily lead limit."[9]

26.     Additionally, the report revealed that "[o]ne serving of Huel's Black Edition plant-based protein powder contained 9.2 micrograms of cadmium, more than double the level that public health authorities and [Consumer Reports]'s experts say may be harmful to have daily, which is 4.1 micrograms."[10]

### *The Harmful Effects of Lead Consumption*

27.     Lead exposure can impact several body systems. Once absorbed by the body, lead is distributed throughout the brain, liver, kidneys, and bones. It interferes with biochemical processes by binding to enzymes, mimicking other important metals (such as calcium) in cells, and thereby disrupting cellular and nerve-cell functions.[11]

28.     Lead remains in the body, stored in the teeth and bones where it accumulates over time. Lead stored in bone may be released into the blood during pregnancy and expose the fetus to the toxic metal.[12]

29.     As a cumulative toxicant, lead affects multiple organ systems, including the neurological, hematological, gastrointestinal, cardiovascular, immune, and renal systems. Even small amounts of exposure can cause serious health problems.[13] At very high levels, lead

---

[9] *Id.*
[10] *Id.*
[11] *What Are Possible Health Effects From Lead Exposure?*, Agency for Toxic Substances and Disease Registry, https://archive.cdc.gov/www_atsdr_cdc_gov/csem/leadtoxicity/physiological_effects.html (last reviewed May 24, 2023).
[12] *Lead Poisoning*, World Health Organization, (Sept. 27, 2024), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.
[13] *Lead Poisoning*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717 (last visited Oct. 30, 2025).

poisoning can be fatal.[14] According to the World Health Organization, "[t]here is no known safe blood lead concentration."[15]

30.     In adults, lead exposure has been linked to increased blood pressure, cardiovascular disease, and kidney damage.[16] Low levels of exposure in children is associated with reduced IQ, attention-span problems and behavioral changes.[17] Young children absorb the toxicant more easily than adults, making their developing nervous systems more sensitive to its effects.[18] Because lead crosses the placenta, lead exposure during pregnancy can affect fetal growth, oftentimes causing low birth weight or pre-term birth.[19]

31.     According to the U.S. Centers for Disease Control, "The effects of lead poisoning can be permanent and disabling."[20]

### The Harmful Effects of Cadmium Consumption

32.     Cadmium, like lead, is a naturally occurring heavy metal that "causes direct harm to humans in several forms."[21]

33.     Cadmium is considered a cancer-causing agent,[22] and "any cadmium exposure should be avoided."[23]

---

[14] *Id.*
[15] *Lead Poisoning*, World Health Organization, (Sept. 27, 2024), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.
[16] *Id.*
[17] *Exposure To Lead: A Major Public Health Concern*, WHO (2021), https://www.who.int/publications/i/item/9789240037656.
[18] *Lead Poisoning*, World Health Organization, (Sept. 27, 2024), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.
[19] *Id.*
[20] *About Childhood Lead Poisoning Prevention*, CDC (Aug. 21, 2025), https://www.cdc.gov/lead-prevention/about/index.html.
[21] Andrew L. Koons; Venkat Rajasurya, *Cadmium Toxicity*, National Library of Medicine (Aug. 14, 2023), https://www.ncbi.nlm.nih.gov/books/NBK536966.
[22] *Current Intelligence Bulletin 42 – Cadmium (CD)*, National Institute for Occupational Safety and Health (June 6, 2014), https://www.cdc.gov/niosh/docs/84-116/default.html.
[23] M. Nathaniel Mead, *CADMIUM CONFUSION: Do Consumers Need Protection?*, Environ Health Perspect. (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210.

34.    Even low levels of exposure over time can cause the substance to build up in the kidneys and result in kidney disease and bone loss.[24]

35.    Other effects of cadmium exposure can include gastrointestinal issues, hemorrhagic gastroenteritis, liver and kidney necrosis, cardiomyopathy, and metabolic acidosis,[25] and has even been linked to cancer.[26]

36.    The U.S. Department of Health, the International Agency for Research on Cancer, and the EPA have all identified cadmium as a human carcinogen.[27]

### Plaintiffs' Purchases of Defendant's Product

37.    Plaintiff Tlaib first purchased the Product from Target in the fall of 2024.

38.    He consumed one serving approximately every day for nearly one year.

39.    Plaintiff Tlaib most recently purchased the Product in the summer of 2025.

40.    Plaintiff Kardel purchased the Product from Amazon in July 2024, and she consumed approximately one serving daily.

41.    Defendant had exclusive or superior knowledge of the contents of the Product and the accuracy of Defendant's representations about the Product.

42.    Prior to purchasing the Product, neither Plaintiffs nor Class Members could reasonably have obtained information that the presence of heavy metals in its Product exceeds safe thresholds.

---

[24] *Id.*
[25] *What Health Effects Are Associated With Acute High-Dose Cadmium Exposure?*, Agency for Toxic Substances and Disease Registry, https://archive.cdc.gov/www_atsdr_cdc_gov/csem/cadmium/Acute-Effects.html (last visited Oct. 30, 2025).
[26] M. Nathaniel Mead, *CADMIUM CONFUSION: Do Consumers Need Protection?*, Environ Health Perspect. (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3002210.
[27] *Public Health Statement for Cadmium*, Agency for Toxic Substances and Disease Registry, https://wwwn.cdc.gov/TSP/PHS/PHS.aspx?phsid=46&toxid=15 (last visited Oct. 30, 2025).

43.     The presence or serious risk of exposure to heavy metals is material to customers when making their purchasing decisions.

44.     As a result, Defendant materially misled its customers by misrepresenting the Product's safeness for daily consumption, and separately by failing to disclose that its Product contained dangerous contaminants in excess of safe levels. This omission deprived Plaintiffs and other Class Members of the benefit of their bargain by causing them to pay a premium for a product that they otherwise would not have paid for had they been fully informed. If Plaintiffs and other Class Members were aware of the unsafe levels of heavy metals found in Defendant's Product, they would have purchased less expensive, comparable protein powders in the market.

*Defendant's Business Structure*

45.     Defendant Huel, Inc. is a subsidiary of Huel Ltd, which is based in the United Kingdom. Defendant's business operations in the United States emanate from its headquarters located in Brooklyn, New York (the "NYC Office").

46.     The NYC Office is home to Defendant's USA Customer Experience, Logistics, Supply Chain, Technical, Retail, and Marketing teams.

47.     Defendant's NYC Supply Chain and Logistics teams work to "manage the inbound flow of the very best ingredients that are sourced from all over the world" before they are delivered to Defendant's manufacturers and subsequently to its customers. [28]

48.     Defendant's NYC Office is the heart of its operations in the United States. Defendant's employees handling everything from product operations and logistics across the supply chain to marketing and retail placement all work from the NYC Office.

---

[28] *Our Teams*, Huel, https://careers.huel.com/departments/supply-chain-logistics (last visited Oct. 30, 2025).

49.    Defendant does not have a presence in any other U.S. state matching the concentration of its presence in the NYC Office. Defendant's presence in the U.S. market as well as the advertising to its U.S. customers are substantially connected to its operations in its NYC Office.

## CLASS ALLEGATIONS

50.    Plaintiffs bring this class action under Federal Rule of Civil Procedure 23 and seek certification of the claims and issues in this action pursuant to the applicable provisions of Rule 23. Plaintiffs seek certification of the following Classes and Subclasses.

**The Nationwide Class:**

All persons residing in the United States or its territories who purchased Defendant's Product at any time within the applicable limitations period.

**The New York Subclass**

All persons residing in New York who purchased Defendant's Product at any time within the applicable limitations period.

**The California Subclass**

All persons residing in California who purchased Defendant's Product at any time within the applicable limitations period.

**The Illinois Subclass**

All persons residing in Illinois who purchased Defendant's Product at any time within the applicable limitations period.

51.    Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or to add or modify subclasses after having had an opportunity to conduct discovery.

52.    Numerosity. Fed. R. Civ. P. 23(a)(1). Defendant reports having more than 4,000,000 customers, a substantial percentage of whom are within the United States. At a minimum, there are hundreds of thousands of Class Members but very likely many more. The

exact size of the proposed class can be ascertained from Defendant's records and those of the retailers that sell the Product.

53.     Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members. Common issues include but are not limited to:

a.   Whether Defendant's marketing, advertising, labeling, and other representations regarding the Product was misleading and/or deceptive;

b.   Whether Defendant's conduct is deceptive in violation of consumer protection laws;

c.   Whether Defendant was unjustly enriched at Plaintiffs' and the Class Members' expense;

d.   Whether Defendant's conduct breached the implied warranty of merchantability;

e.   The nature of the relief, including equitable relief, to which Plaintiffs and the class are entitled; and

f.   Whether Plaintiffs and Class Members are entitled to reasonable attorneys' fees and costs.

54.      Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of the claims of the Class(es) they seek to represent. Plaintiffs and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendant's unlawful conduct.

55.     Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class(es). Further, Plaintiffs have retained counsel with extensive experience litigating complex class actions. Plaintiffs'

counsel has been appointed by state and federal courts to represent certified classes in dozens of cases.

56.    Superiority. Fed. R. Civ. P. 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy. The claims of Plaintiffs and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendant, and it would be impracticable for class members to seek redress individually. Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments. Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendant's misconduct. Class certification is therefore appropriate under Rule 23(b)(3).

57.    Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

58.    Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2), as Defendant has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

## <u>FIRST CAUSE OF ACTION</u>

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### On behalf of Plaintiffs and the Nationwide Class

59.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

14

60.     Pursuant to NY GBL § 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state" are unlawful.

61.     Defendant's conduct is subject to NY GBL's prohibition on deceptive acts because its operations are centered in Brooklyn, New York where it maintains supply chain, logistics, and marketing teams—all of which contribute to the conduct alleged herein.

62.     Defendant's representations regarding the Product in its marketing and promotion of the same constitute misleading and deceptive practices in violation of GBL § 349.

63.     Defendant made materially misleading statements and omissions regarding the health and safety of its Product, which prevented Plaintiff and the Class from learning that Defendant's Product contained dangerous contaminants like lead and cadmium.

64.     The presence or risk of heavy metals in a product marketed as healthy and safe for daily consumption is a material fact that a reasonable consumer would consider when making their purchasing decision.

65.     Defendant's acts and omissions caused Plaintiffs and the Class to reasonably believe that they were purchasing for consumption a product that was healthy and safe. Plaintiffs and the Class reasonably relied on Defendant's material representations and omissions when purchasing the Product. Defendant failed to disclose or intentionally concealed the presence or risk of harmful contaminants in the Product, including lead and cadmium, which would have been a material consideration of Plaintiffs and the Class's purchasing decisions.

66.     Defendant's deceptive acts and omissions deprived Plaintiffs and the Class of the benefit of their bargain. By failing to disclose or intentionally concealing the presence or risk of heavy metals in the Product, Defendant caused Plaintiffs and the Class to pay a premium for a purportedly safe and nutritious product.

67.    Defendant knew or should have known that its material representations and omissions regarding the safety of the Product were false or misleading, yet caused such representations be promoted and distributed throughout New York and nationwide through advertising, marketing, and other promotional channels.

68.    Defendant's deceptive acts and omissions directly and proximately caused Plaintiffs and other Class Members to suffer an ascertainable loss. Plaintiffs would not have purchased, and at a minimum would not have paid the same price for, Defendant's Product had Defendant disclosed the risk and/or presence of dangerous contaminants in its Product.

69.    Comparable and less expensive products similar to those of Defendant's without excessive heavy metal content are widely available, and Plaintiffs and other Class Member could have purchased those alternatives had they been informed of the dangerous heavy metals present in Defendant's Product.

70.    Plaintiffs seek all damages available under the law, including but not limited to monetary, statutory damages, compensatory, treble and punitive damages, restitution, and disgorgement of all monies obtained as a result of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

71.    Defendant's conduct also caused substantial injury to the public, who relied on Defendant's representations that the Product was healthy and safe for daily use and were unaware of Defendant's material omissions. Defendant's failure to disclose that the Product contained or had a risk of containing toxic heavy metals like lead and cadmium deprived consumers of the ability to make an informed decision whether to purchase and thereby ingest the Product. Aside from the economic harm this caused, the trust of the public in products that claim to be nutritious,

healthy, and safe for everyday use is compromised. Defendant's conduct must be enjoined so as to not cause further irreparable harm and risk of further injury.

## SECOND CAUSE OF ACTION

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
### On behalf of Plaintiffs and the Nationwide Class

72.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

73.    Pursuant to NY GBL § 350, "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state" is declared unlawful.

74.    Defendant has targeted Plaintiffs and the Class through its advertising and marketing of the Product, which falsely advertised and marketed the product as safe, healthy, and nutritious in violation of GBL § 350.

75.    Defendant had exclusive knowledge of the heavy metals in its Product.

76.    Defendant knew or should have known that its material representations regarding the safety of the Product were false or misleading, yet caused such representations be promoted and distributed throughout New York and nationwide through advertising, marketing, and other promotional channels. Defendant's misrepresentations were material and substantially uniform in content, presentation, and impact upon Plaintiffs and the Class.

77.    Plaintiffs seek all damages available under the law, including but not limited to monetary, statutory damages, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained as a result of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

78.    Defendant's conduct also caused substantial injury to the public who relied on Defendant's representations that the Product was healthy and safe for daily use and were unaware of Defendant's material omissions. Defendant's failure to disclose that the Product contained or

had a material risk of containing toxic heavy metals like lead and cadmium deprived consumers of the ability to make an informed decision as to whether to purchase and thereby ingest the Product. Aside from the economic harm this caused, the trust of the public in products that claim to be nutritious, healthy, and safe for everyday use is compromised. Therefore, Defendant's conduct must be enjoined so as to not cause further irreparable harm and risk of further injury.

### THIRD CAUSE OF ACTION

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")
CALIFORNIA BUSINESS AND PROFESSIONAL CODE § 17200 et seq.**

**On behalf of Plaintiff Amy Kardel and the California Subclass**

79.     Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

80.     Pursuant to Cal. Bus. & Prof. Code § 17200, unfair competition includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

81.     Defendant violated the UCL by advertising the Product in an "unfair, deceptive, untrue or misleading" manner, representing that it is safe and healthy while failing to disclose the risk or presence of heavy metal contaminants.

82.     Defendant engaged in "unlawful, unfair or fraudulent acts or practices" by deceiving Plaintiff Kardel and the California Subclass through representations that the product is safe and healthy while failing to disclose the risk or presence of heavy metal contaminants.

83.     Defendant's failure to inform the public about the presence or material risk of presence of heavy metals in its product is likely to deceive the public, thereby constituting a fraudulent act or practice.

84.     Defendant's failure to inform the public about the presence or material risk of presence of heavy metals in its product violates at least the following other laws: (1) the CLRA,

California Business & Professions Code § 1750, *et seq.*, and (2) the False Advertising Law, California Business & Professions Code § 17500, *et seq.*

85.    Defendant's conduct was also unfair by deceiving its customers and the public into thinking that they were purchasing a product that was healthy and safe for daily consumption.

86.    Plaintiff Kardel and the California Subclass relied on Defendant's unfair, deceptive, untrue, and misleading representations regarding the product's healthiness and safety to their detriment.

87.    Plaintiff and the California Subclass paid a price for the Product that they would not have otherwise paid had they been fully informed about the presence or risk of dangerous toxicant exposure. Additionally, Plaintiff and the California Subclass would not have purchased Defendant's Product had they been informed about the presence or risk of heavy metals exposure.

88.    As a result of Defendant's unfair and fraudulent conduct, Plaintiff Kardel and the California Subclass seek an Order from this Court enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices pursuant to Cal. Bus. & Prof. Code § 17203. Defendant's misleading marketing is ongoing and will continue to harm the public absent a permanent public injunction.

89.    Plaintiff Kardel further seeks all other relief allowable pursuant to Cal. Bus. & Prof. Code § 17200 *et seq.*, including an order for the restitution of all monies that were unjustly acquired from the sale of the Product to Plaintiff Kardel and the California Subclass through acts of fraudulent, unfair, or unlawful competition.

90.    Plaintiff additionally seeks an award of attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW ("FAL")
CALIFORNIA BUSINESS AND PROFESSIONAL CODE § 17500 et seq.**

**On behalf of Plaintiff Amy Kardel and the California Subclass**

91.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

92.    The FAL prohibits the dissemination of untrue or misleading information that is known, or through the exercise of reasonable care should be known, to be false or misleading. It also prohibits advertising products with the intent not to sell them as advertised.

93.    Defendant knew, or reasonably should have known at all relevant times, that its failure to disclose the presence or risk of heavy metals in the Product rendered its "healthy and safe" representations untrue and misleading. Plaintiff Kardel and the California Subclass relied on these deceptive misrepresentations in deciding to purchase Defendant's Product.

94.    Defendant's deceptive conduct directly and proximately caused Plaintiff Kardel and the California Subclass to suffer an ascertainable loss. Plaintiff and the Subclass would not have purchased, and at a minimum would not have paid the same price for, Defendant's Product had Defendant disclosed the risk and/or presence of dangerous contaminants in its Product.

95.    As a result of Defendant's materially misleading conduct, Plaintiff Kardel and the California Subclass seek an Order enjoining Defendant from continuing to engage in such further dissemination of false or misleading information regarding its Product. Aside from the economic harm this caused, the trust of the public in products that claim to be nutritious, healthy, and safe for everyday use is compromised. Defendant's misleading marketing is ongoing and will continue to harm the public absent a permanent public injunction.

96.    Plaintiff Kardel further seeks all other relief allowable under the law, including an order for the restitution of all monies that were unjustly acquired from the sale of the Product to Plaintiff Kardel and the California Subclass through acts of fraudulent, unfair, or unlawful competition.

97.    Additionally, Plaintiff seeks an award of attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**

**VIOLATIONS OF THE CALIFORNIA CONSUMER
LEGAL REMEDIES ACT ("CLRA")
CALIFORNIA CIVIL CODE § 1750 et seq.**

**On behalf of Plaintiff Amy Kardel and the California Subclass**

98.     Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

99.     Plaintiff Kardel and members of the California Subclass are "consumers" within the meaning of Cal. Civ. Code § 1761(d), and their purchases of Defendant's Product constitutes a "transaction" within the meaning of Cal. Civ. Code § 1761(e). Defendant's Product is a "good" within the meaning of Cal. Civ. Code § 1761(a).

100.     Defendant's deceptive advertising of its Product as safe and healthy and its failure to disclose the risk or presence of dangerous contaminants constitutes business practices that violate the CLRA. More specifically, Defendant has violated Cal. Civ. Code § 1770(a) by, *inter alia:*

      a.  Representing that the Product has characteristics, benefits, or uses which it does not have;

      b.  Representing that the Product is of a particular standard, quality and/or grade that is untrue; and

      c.  Advertising the Product without the intent to sell them as advertised.

101.     Defendant's violations of the CLRA directly and proximately caused Plaintiff Kardel and the California Subclass to suffer an ascertainable loss. Plaintiff and the Subclass would not have purchased, and at a minimum would not have paid the same price for, Defendant's Product had Defendant disclosed the risk and/or presence of dangerous contaminants in its Product.

102.    As a result of Defendant's materially misleading conduct, Plaintiff Kardel and the California Subclass seek an Order enjoining Defendant from continuing to engage in such further dissemination of false or misleading information regarding its Product. Aside from the economic harm this caused, the trust of the public in products that claim to be nutritious, healthy, and safe for everyday use is compromised. Defendant's conduct is ongoing and will continue to harm the public absent a permanent public injunction.

103.    Concurrent with the filing of this Complaint, Plaintiff Kardel will provide Defendant with notice pursuant to Cal. Civ. Code § 1782 and will, absent corrective action, amend this Complaint to seek actual damages.

104.    Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiffs' desire to purchase Defendant's Product in the future if they can be assured that it is truly safe for consumption and does not contain dangerous heavy metals.

105.    Additionally, Plaintiff seeks an award of attorneys' fees and costs.

**<u>SIXTH CAUSE OF ACTION</u>**

**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("ICFA") 815 ILCS 505 et seq.**

**On behalf of Plaintiff Mohamad Tlaib and the Illinois Subclass**

106.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

107.    Under 815 ILCS 505/2, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce" is unlawful.

108.     Defendant deceived Plaintiff Tlaib and the Illinois Subclass by misrepresenting that the Product was safe and healthy and omitting the material fact that the Product contains dangerous contaminants like lead and cadmium.

109.     Defendant intended for Plaintiff Tlaib and the Illinois Subclass to rely on the misrepresentations regarding the Product's nutritious nature and that it was safe for consumption and free from contaminants.

110.     Defendant's sale of the Product and Plaintiff Tlaib and the Illinois Subclass's purchase of the same constitutes "trade or commerce" within the meaning of 815 ILCS 505/1(f) and 505/2.

111.     Plaintiff Tlaib and the Illinois Subclass are "consumers" within the meaning of 815 ILCS 505/1(e).

112.     Defendant's deceptive conduct deprived Plaintiff Tlaib and the Illinois Subclass of the benefit of their bargain and caused them to suffer an ascertainable loss. Plaintiff and the Subclass would not have purchased, and at a minimum would not have paid the same price for, Defendant's Product had Defendant disclosed the risk and/or presence of dangerous contaminants in its Product.

113.     Plaintiffs seek all damages available under the ICFA, including but not limited to monetary, statutory damages, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained as a result of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

114.     As a result of Defendant's materially misleading conduct, Plaintiff Tlaib and the Illinois Subclass seek an Order enjoining Defendant from continuing to engage in such further conduct that violates the ICFA. Aside from the economic harm this caused, the trust of the public

in products that claim to be nutritious, healthy, and safe for everyday use is compromised. Defendant's conduct is ongoing and will continue to harm the public absent a permanent public injunction.

### SEVENTH CAUSE OF ACTION

**VIOLATIONS OF THE ILLINOIS UNIFORM
DECEPTIVE TRADE PRACTICES ACT ("UDTPA")
815 ILCS 510 et seq.**

**On behalf of Plaintiff Mohamad Tlaib and the Illinois Subclass**

115.   Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

116.   Defendant's deceptive advertising of the Product as safe and healthy and its failure to disclose the risk or presence of dangerous contaminants constitutes business practices that violate the UDTPA. More specifically, Defendant has violated 815 ILCS 510/2 by *inter alia:*

    a.   Representing that the Product has characteristics, uses, or benefits which it does not have;

    b.   Representing that the Product is of a particular standard, quality and/or grade that is untrue; and

    c.   Advertising the Product without the intent to sell them as advertised.

117.   Defendant's violations of the UDTPA directly and proximately caused Plaintiff Tlaib and the Illinois Subclass to suffer damages by depriving them of the benefit of their bargain and causing them to suffer an ascertainable loss. Plaintiff and the Subclass would not have purchased, and at a minimum would not have paid the same price for, Defendant's Product had Defendant disclosed the risk and/or presence of dangerous contaminants in its Product.

118.   As a result of Defendant's deceptive business practices, Plaintiff Tlaib and the Illinois Subclass seek an Order enjoining Defendant from continuing to engage in such further conduct that violates the UDTPA. Aside from the economic harm this caused, the trust of the

public in products that claim to be nutritious, healthy, and safe for everyday use is compromised. Defendant's conduct is ongoing and will continue to harm the public absent a permanent public injunction.

119.    Defendant willfully engaged in the deceptive trade practices complained of herein. Plaintiffs additionally seek an award of attorneys' fees and costs pursuant to 815 ILCS 510/3.

## EIGHTH CAUSE OF ACTION

### UNJUST ENRICHMENT

### On behalf of Plaintiffs and the Nationwide Class

120.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

121.    Plaintiffs and the Class Members conferred a benefit on Defendant in the form of funds paid for the Product.

122.    Defendant knew or reasonably should have known that its Product contained toxic heavy metals. Defendant additionally knew that its failure to disclose the presence or risk of exposure to the dangerous contaminants, while advertising the product as safe and healthy, would materially mislead consumers in violation of the law.

123.    By taking and retaining possession and control of funds paid by Plaintiffs for the deceptively advertised Product, Defendant was enriched at Plaintiffs' expense. It is contrary to justice and good conscience to permit to Defendant to retain the funds Plaintiffs originally remitted for products containing dangerous contaminants that Defendant knowingly marketed as healthy and safe for daily consumption.

124.    Defendant nevertheless retained Plaintiffs' funds anyway and diverted them for its own purposes, unfairly without adequate justification.

125.    Plaintiffs and the Class Members are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

126.    Plaintiffs, the Class, and the public at large have suffered immediate and irreparable injury as a result of Defendant's conduct and will continue to do so absent an injunction issued by this Court.

127.    As a result of Defendant's wrongful conduct, Plaintiff and the Class Members seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other relief this Court deems just and proper.

## NINTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

#### On behalf of Plaintiffs and the Nationwide Class

128.    Plaintiffs incorporate all preceding factual allegations as if fully set forth herein.

129.    A warranty that Defendant's Product was merchantable and fit for the ordinary purposes for which such goods are used was implied by law into the sale of the Product.

130.    Defendant's Product that Plaintiffs and the Class purchased constitutes goods.

131.    Defendant is a merchant with respect to goods of the kind at issue here.

132.    There was a sale of goods from Defendant to Plaintiffs and the Class Members.

133.    Defendant's express warranties and representations made regarding its Product became part of the basis of the bargain between Plaintiffs and the Class Members, which created an implied warranty that the Product would conform to those representations and descriptions.

134.    The products were not fit for their ordinary purpose (consumption by consumers) as they contained undisclosed and unsafe levels of heavy metals that do not conform to the packaging of the Product.

135.    By failing to provide a meal replacement Product that is free from unsafe levels of heavy metals like lead and cadmium, Defendant violated the implied warranty.

136.    Defendant's breach of the implied warranty directly and proximately caused Plaintiffs and the Class to suffer an ascertainable loss. Plaintiffs would not have purchased, and at a minimum would not have paid the same price for, Defendant's Product had Defendant disclosed the risk and/or presence of dangerous contaminants in its Product.

137.    As a result of Defendants' conduct, Plaintiffs and other Class Members suffered damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the classes of similarly situated individuals, request the Court to:

(a)    Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiffs as representative of the class(es) and designate counsel of record as class counsel;

(b)    Order Defendant to provide actual damages and equitable monetary relief (including restitution) to Plaintiffs and class members and/or order Defendants to disgorge profits they realized as a result of their unlawful conduct;

(c)    Order Defendant to pay punitive damages, as allowable by law, to Plaintiffs and class members;

(d)    Order Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiffs and class members;

(e)    Declare Defendant conduct unlawful and enter an order enjoining Defendant from continuing to engage in the conduct alleged herein;

(f)    For both pre- and post-judgment interest at the maximum allowable rate on any amounts awarded;

(g)    For costs of the proceedings herein;

(h)    For reasonable attorneys' fees as allowed by law; and

(i)    Award such other relief as the Court deems appropriate under the circumstances.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on issues so triable.

DATED: October 31, 2025                        Respectfully submitted,


COULSON P.C.
*/s/ Nicholas A. Coulson*
Nicholas A. Coulson, Esq.*
300 River Place Drive
Suite 1700
Detroit, Michigan 48207
T: (313) 644-2685
Nick@CoulsonPC.com

*\*pro hac vice application to be submitted*

*Attorney for Plaintiffs and the Putative Class*